# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH CALVERT,<br><br>Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL,[1]<br>Acting Commissioner of Social Security,<br><br>Defendant. | CASE NO. 4:16-cv-00639-GBC<br><br><br><br>(MAGISTRATE JUDGE COHN)<br><br>OPINION AND ORDER TO DENY<br>PLAINTIFF'S APPEAL |

## OPINION AND ORDER TO DENY PLAINTIFF'S APPEAL

This matter is before the undersigned United States Magistrate Judge for decision. Kenneth Calvert ("Plaintiff") seeks judicial review of the Commissioner of the Social Security Administration's decision finding of not disabled. As set forth below, the Court **DENIES** Plaintiff's appeal and **AFFIRMS** the Commissioner's decision in this case.

## I. STANDARD OF REVIEW

To receive disability or supplemental security benefits under the Social Security Act ("Act"), a claimant bears the burden to demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); accord 42 U.S.C. § 1382c(a)(3)(A).

The Act further provides that an individual:

shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his

---

[1] Effective January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d)(1), Commissioner Berryhill is automatically substituted as the defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). Plaintiff must demonstrate the physical or mental impairment "by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750. The claimant bears the burden of proof at steps one through four. See Wells v. Colvin, 727 F.3d 1061, 1064 at n.1. (10th Cir. 2013). If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Id.

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See e.g., 42 U.S.C. § 405(g) ("court shall review only the question of conformity with such regulations and the validity of such regulations"); Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated

Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the [Administrative Law Judge's ("ALJ's")] findings in order to determine if the substantiality test has been met." Id. The Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## II. BACKGROUND

**A.    Procedural History**

In September 2013, Plaintiff protectively applied for Disability Insurance Benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 416(i) and 423, and Supplemental Security Income ("SSI") payments under Title XVI of the Act. (Tr. 184-94). Plaintiff alleged disability since August 19, 2011 (Tr. 184), due to depression and injuries to his neck, shoulders, back, and hip. (Tr. 213, 260). At the administrative hearing, Plaintiff appeared and testified with the assistance of a non-attorney representative (his primary representative was an attorney), and a vocational expert also testified. (Tr. 11, 29-50). On March 27, 2015, the ALJ issued a decision finding Plaintiff not disabled. (Tr. 8-28). Plaintiff requested review of the ALJ's decision by the agency's Appeals Council. (Tr. 7, 284-85). The Appeals Council denied Plaintiff's request (Tr. 1-5), making the ALJ's decision the Commissioner's final decision for purposes of judicial review. See 20 C.F.R. § 422.210(a).2. Plaintiff was 47 years old on the date of the Commissioner's final decision. (Tr. 184, 188).

//

# III. ISSUES AND ANALYSIS

On appeal, Plaintiff alleges three errors: (1) failing to investigate and elicit from the vocational expert ("VE") an explanation as to the conflict between the VE's testimony and the Dictionary of Occupational Titles ("DOT"); (2) failing to properly analyze whether Plaintiff meets Listing 12.05 of the Listings of Impairment found in 20 CFR Part 404, Subpart P, Appendix 1; and (3) failing to properly determine Plaintiff's Residual Functional Capacity ("RFC"). (Pl. Br. at 10, Doc. 28).

**A.     Step Five and VE Testimony**

**1.     Performance of Other Work**

Plaintiff contends the ALJ erred at Step Five of the sequential evaluation process by finding Plaintiff could perform the jobs identified by the VE because they require some level of reading and language development. (Pl. Br. at 11, 13-14). In the decision, the ALJ reviewed the record and Plaintiff's testimony prior to evaluating his RFC:

> The claimant has the following severe impairments: borderline intellectual functioning, depression, rotator cuff repair of both shoulders, degenerative joint disease of the AC joint, and mild degenerative disc disease of the lumbar spine …
>
> At the hearing, the claimant testified as follows:
>
> He had worked as a welder and had been a big drill machinist. He also had some self-employment earnings. He had surgery on his shoulders and they hurt. He had not worked since then. He cannot work because of his shoulders, hips and sleep apnea. He has had surgery on both shoulders which did not work. He had three discs in his back that were messed up and decompression was supposed to help. It was not surgery; they stretched him in the doctor's office. His pain is located in both shoulders, his back and his hips. It is an aching, burning pain that is always there. Movement makes it worse.
>
> He does not lift things. He might help his wife carry in a carton of eggs or a gallon of milk but he does not lift a bag of potatoes. If he bends over it is hard [for] him to straighten back up. Pain is there all the time but it is worse if he bends over. It is sharp pain. When he bends over to tie his shoes it shoots down his right leg. His right hip is worse than his left hip. Stooping and bending make it worse. He takes pain medications of Tramadol and Cymbalta and three more medications

that he does not remember … He also takes over the counter pain pills. Dr. Anthony prescribed the pain medications. Cymbalta makes him sleepy so he takes it at night. He did physical therapy after the surgery. It helped some but he still hurt.

During the day he goes out to look at his children's small dogs. His wife does not work. His income is from the multiple injury fund from the state of Oklahoma. He gets food stamps. His children are 8 and 15 years of age. His wife and daughter do the housework. His son does the yard work. His wife does the grocery shopping.

His wife helped him to fill out job applications. He knew someone at Linde's that helped him get the job and he got help learning how to weld. He also got help with reading instructions. He went to Tulsa Tech but did not pass. When he was at Mahle's, the boss and other employees helped him figure out the paperwork and they would show him how to drill. His wife filled out the social security paperwork. He has trouble reading and writing. He had help taking his driving test.

He lies down during the day to keep from hurting. He had mentioned to his doctor that he went outside to garden, but he mostly watched his son and picked a few berries. He does attend church but will sometimes miss because he does not feel like going and sometimes he [has pain] and does not feel like sitting there.

He drives to town to get a bag o[f] ice o[r] a little something but driving makes him nervous. He does go on walks. A year or so ago he got lost when walking and his son found him …

the claimant never underwent specialized mental health treatment, but rather, he was prescribed psychotropic medications by his primary care provider, or his pain management physician, Dr. Anthony …

The claimant presented for a consultative examination with Heather Ranger Kobel, Ph.D. on November 22, 2013 … On a mental status exam, Dr. Kobel noted the claimant presented as mildly depressed with congruent affect … He was able to read, write, and comprehend as evidenced by his successful completion of the screening forms, although his wife was observed assisting him. He was able to follow basic, three-step instructions. He exhibited some situational memory problems but concentration and attention were adequate. He made very intense eye contact when his wife was not in the room but appropriate eye contact when she was in the room. His intelligence would be estimated as below average and he exhibited poor social skills. The claimant was able to provide appropriate responses to questions related to judgment, insight, and abstraction; however, he was not able to perform serial 7s. Dr. Kobel's diagnosis was depression, NOS, rule out malingering, rule out personality disorders and learning disorders. His GAF score was 63 …

> The claimant has a high school education and is able to communicate in English. Because testing shows his word recognition scores at the 5th grade level, he is not illiterate, and I will consider him to have a marginal education for the purposes of this decision.

(Tr. 13, 16-20, 22). Thus, the ALJ reviewed Plaintiff's allegations regarding his ability to read. From the record, the ALJ found Plaintiff had the RFC to perform:

> a reduced range of light work … Specifically, the claimant can lift and / or carry up to 20 pounds occasionally and up to 10 pounds frequently. He can stand and / or walk a combined total of 6 hours in an 8-hour day and sit up to 6 hours in an 8-hour day. He can only occasionally push and / or pull with his upper extremities or reach overhead; he can never climb ladders, ropes, or scaffolds. He can understand, remember and carry out simple instructions and can only have superficial and incidental interaction with coworkers and supervisors and no public interaction should be required to complete his job duties.

(Tr. 16). The ALJ formulated the RFC from consideration of all of the evidence. Plaintiff states the ALJ erred by failing to resolve the conflicts between the VE's testimony and the DOT job descriptions requiring reading. (Pl. Br. at 14). Plaintiff argues the ALJ asked the VE whether a conflict existed but did nothing further. (Id. at 15). However, the VE testified an individual could still perform these jobs if he was unable to read and write. (Tr. 48). Moreover, the DOT descriptions of several of the jobs show they do not entail any reading, specifically the jobs of bench assembler (fabricator, foam rubber), DOT No. 780.685-062, 1991 WL 680789; office cleaner (cleaner, housekeeping), DOT No. 323.687-014, 1991 WL 672783; and grinding machine operator (convex-grinder operator), DOT No. 673.685-042, 1991 WL 677997.

Plaintiff contends each of the jobs identified by the VE require some level of reading and have a GED level "1" or "2" for Language Development. (Pl. Br. at 13). See Press Machine Operator, DOT 690.685-326, 1991 WL 678578; Office Cleaner, DOT 323.687-014, 1991 WL 672783; Bench Assembler, DOT 80.684-062, 1991 WL 680789; Grinding Machine Operator, DOT 673.685-042, 1991 WL 677997; Circuit Board Assembler, DOT 726.684-110, 1991 WL 679616; and Clerical Mailer, DOT 209.587-010, 1991 WL 671797. However, GED levels note the

6

educational level required for a job rather than a job's duties. GED does not describe the specific mental or skill requirement of a particular job, but instead describes the general educational background to ordinarily make an individual suitable for the job. The DOT explains:

> General Educational Development embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance. This is education of a general nature which does not have a recognized, fairly specific occupational objective. Ordinarily, such education is obtained in elementary school, high school, or college. However, it may be obtained from experience and self-study.

DOT, App. C, § III, 1991 WL 688702. Thus, GED does not describe the duties, requirements, or demands of any particular occupation listed in the DOT. Rather, GED describes in general terms the educational level expected of someone who performs a given occupation. RFC represents the most a claimant can do despite the physical or mental limitations caused by his medical impairments; it does not incorporate educational background. See 20 C.F.R. §§ 404.1545(a), (c) (defining RFC and enumerating mental abilities, including understanding, remembering, and carrying out instructions, and responding appropriately to supervision, co-workers, and work pressures), 404.1560(c) (distinguishing between RFC and vocational characteristics, including education, considered at step five). A district court in Utah recently found:

> Moreover, there was no conflict between the jobs identified and the RFC finding or hypothetical question to the VE. Plaintiff contends that the jobs identified by the VE conflict with the RFC limitation to "simple, repetitive tasks" because they require a general educational development (GED) reasoning level of 3 (Pl. Br. at 21–23). But, both the DOT and Tenth Circuit case law recognize that GED levels do not describe the specific mental or skill requirements of a particular job. Instead, GED levels describe the general educational background that would ordinarily make an individual suitable for the job. DOT App. C, § III, available at 1991 WL 688702. GED does not describe the duties, the requirements, or the particular mental demands of any particular occupation listed in the DOT. Rather, GED describes in general terms the educational level expected of someone who performs a given occupation. See Anderson v. Colvin, 514 Fed. Appx. 756, 764 (10th Cir. 2013); Mounts v. Astrue, 479 Fed. Appx. 860, 868 (10th Cir. 2012). Thus, because there was no conflict between the jobs identified by the VE and adopted by the ALJ in his step five findings, the Court finds no error in the ALJ's decision.

Mills v. Berryhill, No. 2:16-CV-01209-DBP, 2017 WL 4857553, at *5 (D. Utah Oct. 25, 2017). Similarly, in this case, there was no apparent conflict between the ALJ's RFC finding – limiting Plaintiff to understanding, remembering, and carrying out simple instructions with only superficial and incidental interaction with coworkers and supervisors and interaction with the public – and the VE's testimony a hypothetical individual could perform occupations with GED language levels of 1 or 2.

Plaintiff's contention the ALJ erred in relying on the vocational expert's testimony is not based on the regulations or the DOT, but instead implicates the Tenth Circuit's decision in Hackett v. Barnhart, 395 F.3d 1168 (10th Cir. 2005). In Hackett, the Tenth Circuit found a limitation to "simple and routine work tasks" seemed inconsistent with the demands of level 3 reasoning. (Id. at 1176.) The Tenth Circuit remanded the case so the ALJ could address the "apparent conflict." Id. Thus, in Hackett, the Tenth Circuit did not discuss the claimant's educational level. Id. Although the Tenth Circuit perceived an "apparent conflict" between the claimant's GED levels and the ALJ's RFC finding, the court did not consider whether the "conflict" might be explained since GED describes general educational background, rather than the specific mental or skill requirements of a particular job. Id. Moreover, each of the jobs in this case, identified by the VE, contain reasoning level "1" or "2," as opposed to Hackett, which remanded for a job with reasoning level "3." See Hackett, 395 F.3d 1176; see also Press Machine Operator, DOT 690.685-326, 1991 WL 678578; Office Cleaner, DOT 323.687-014, 1991 WL 672783; Bench Assembler, DOT 80.684-062, 1991 WL 680789; Grinding Machine Operator, DOT 673.685-042, 1991 WL 677997; Circuit Board Assembler, DOT 726.684-110, 1991 WL 679616; and Clerical Mailer, DOT 209.587-010, 1991 WL 671797.

Thus, any arguable deficiency would be harmless, and would not have changed the outcome. See Raymond, 621 F.3d at 1274 (even assuming two of three jobs relied on by the ALJ were erroneous, the court affirmed the ALJ's decision where substantial evidence showed the claimant could do the third job, and the job existed in significant numbers in the national economy). See also Vititoe v. Colvin, 549 F. App'x 723, 729-30 (10th Cir. 2013) (unpublished)[2] (citing Shinseki v. Sanders, 556 U.S. 396, 409-10 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.")). "Our review of the record indicates that the ALJ's question adequately included the limitations that she found were supported by the medical record. That record, along with the VE's testimony on existing jobs, provided substantial evidence to support the ALJ's step-five determination." Talamantes v. Astrue, 370 F. App'x 955, 959 (10th Cir. 2010).

**B.** **Listed Impairment**

**1.** **12.05(C) Intellectual Disability**

Plaintiff contends the ALJ erred by finding Plaintiff did not meet the requirements of Listing 12.05(C) (intellectual disability). (Pl. Br. at 16). Listing § 12.05(C) provides a claimant is disabled per se as follows:

> 12.05 Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied …
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

---

[2] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

9

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05(C).[3] From the definition, the ALJ found the evidence did not show Plaintiff had an IQ score of 60 through 70 or deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence did not demonstrate or support onset of the impairment before the age of 22:

> Finally, the "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. Although the claimant's representative argued the claimant met listing 12.05C, based on a verbal index score of 68 on the Reynolds Intellectual Assessment Scales (RIAS) test administered in August 2007, the claimant worked at skilled jobs for many years before and after the testing where he had an excellent work history of more than 15 years. Additionally, he has no deficits in adaptive behavior.

(Tr. 15). Thus, the ALJ found Plaintiff did not meet the requirements for Listing 12.05 (intellectual disability). While Dr. Fritz found Plaintiff had a verbal intelligence index score of 68 (Tr. 595), she diagnosed borderline intellectual functioning rather than diagnosing Plaintiff with deficits in adaptive functioning for intellectual disability. (Tr. 597). Since Plaintiff's impairments did not meet the introductory paragraph for Listing § 12.05 or the IQ test requirements of paragraph C, his impairment did not meet the listing. Sullivan v. Zebley, 493 U.S. 521, 530 (1990) ("[F]or a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.").

Plaintiff contends he meets the final requirement of 12.05C, i.e., does Plaintiff have an additional impairment or significant work-related limitation of function, and cites Hinkle v. Apfel, 132 F.3d 1349, 1352-53 (10th Cir. 1997), noting the analysis should parallel the step two standard,

---

[3] The agency issued new regulations concerning the mental listings in September 2016, which took effect on January 17, 2017. Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138-01 (Sept. 26, 2016). Since these changes were not in effect at the time of the ALJ's decision in this case, the Court cites the 2016 version of the regulations.

and be made without consideration of whether the claimant can perform any substantial gainful activity beyond step two. (Pl. Br. at 17-18). However, the ALJ found Plaintiff worked at skilled jobs for many years before and after the testing, where he had an excellent work history of more than 15 years. (Tr. 15). Additionally, the ALJ found Plaintiff had no deficits in adaptive behavior. Id. Therefore, substantial evidence supports the ALJ's finding Plaintiff did not have an impairment or combination of impairments that met or medically equaled Listing 12.05(C).

C.  **ALJ's RFC Findings**

Plaintiff states the ALJ erred by failing to properly assess Plaintiff's RFC. (Pl. Br. at 18). Plaintiff contends although the ALJ incorporated a limitation on reaching overhead and pulling and pushing with his upper extremities, the ALJ ignored Plaintiff would be unable to keep up with persistence and pace. (Pl. Br. at 19). The ALJ made the following observations in the decision:

> According to the claimant's Adult Disability Report, received into the claimant's record in September 2013, the claimant stated that the following physical or mental conditions limited his ability to work: shoulder injury, depression, hip injury and back and neck injury …
>
> by October 2013, the claimant reported no issues with pain or limited range of motion to his new primary care physician and the claimant has sought no further treatment except court ordered pain management for his depression …
>
> The claimant injured his back and hip at work in September 2005, which was treated only with medication and physical therapy. In June 2011, the claimant injured his left shoulder at work and was placed on light duty. His primary care physician, David Caughell, MD, referred him for an orthopedic evaluation. He was evaluated by orthopedic surgeon Carl (Tracy) Painter, MD, on July 7, 2011. On examination, the left shoulder demonstrated diffuse weakness with abduction and external rotation. His range of motion was painful and mildly limited. He had a positive impingement sign as well as positive Speed's sign. X-rays demonstrated a type II acromion with no acute bony injury and no significant degenerative changes. Dr. Painter diagnosed the claimant with left shoulder pain and recommended an MRI. The MRI demonstrated no evidence of rotator cuff injury other than some tendinopathy. After trying physical therapy and injections, the claimant underwent a left shoulder arthroscopic SLAP repair and decompression on August 22, 2011. He began physical therapy but underwent a [second surgery], failed left shoulder SLAP repair with adhesive capsulitis, on November 8, 2011, and began physical therapy again. In February 2012, the claimant began to complain of increasing

discomfort in his right shoulder, and on April 16, 2012, the claimant underwent a [third surgery], biceps tenotomy, labral debridement, subacromial decompression and open biceps tenodesis. On June 14, 2012, the claimant reported his pain relief was continuing to improve his right shoulder and he was pleased with the progress. He was also starting to see some improvement in regard to his neck and back pain. Dr. Painter reviewed his MRI of the cervical and lumbar spine and found no evidence of injury. Dr. Painter recommended physical [therapy] to start strengthening his right shoulder without restriction and physical therapy for his cervical and lumbar spine. On July 17, 2012, Dr. Painter discussed with the claimant that he see another physician for spinal decompression and traction and potentially a chiropractor. On October 18, 2012, the claimant had finished his physical therapy and reported his lumbar was better but his neck still hurt.

On November 20, 2012, the claimant sought to establish care with Michael Cooper, DO. The claimant complained of neck pain from a motor vehicle accident in April. On examination, he had bilateral cervical muscle spasms and was tender to palpitation in the paravertebral muscle mass. The claimant had an abnormal range of motion decreased in all planes due to pain and spasm with thoracic and lumbar tightness with decreased range of motion. Dr. Cooper diagnosed the claimant with neck pain, neck injury, and traumatic torticollis. Dr. Cooper prescribed Soma and Cymbalta. On December 11, 2012, the claimant reported the pain was not as bad but he was still having pain. Dr. Cooper decreased the claimant's Soma and added Vimovo. He also prescribed stretching exercises. On January 4, 2013, Dr. Cooper performed osteomanipulative therapy on the claimant's neck with good results. On January 31, 2013, Dr. Cooper completed return to work forms for the claimant and changed his diagnosis to lower back pain.

On August 21, 2013, the claimant presented for a workers' compensation re-evaluation with M. Stephen Wilson, MD, after an initial evaluation on October 12, 2012. Dr. Wilson found that the claimant continued to experience loss of range of motion in his bilateral shoulder. The claimant suffered from pain and weakness in his right hip along with instability. Due to his physical condition, constant pain and diminished self-worth from his inability to work, the claimant had developed a consequential condition of depression. Dr. Wilson opined the claimant was unable to lift or carry more than 15 pounds or perform duties that involved bending, twisting, or squatting. He was able to tolerate a short time of sitting or standing before he must change positions and had great difficulty performing overhead or away-from-the body movements. Additionally, Dr. Wilson found that claimant must lie down several times per day to obtain partial relief of his symptoms. Dr. Wilson found the claimant was permanently totally disabled from performing any gainful employment.

On October 1, 2013, the claimant presented to Curtis Phillips, DO, to establish care. The claimant reported no neck pain or stiffness, no muscle aches, no localized joint pain or joint stiffness and no depression, anxiety, or sleep disturbances. On examination, he was oriented to time, person, and place and was in no acute distress. His neck was supple, his back was normal and overall findings

of his musculoskeletal system were normal. Dr. Phillips diagnosed the claimant with benign essential hypertension, benign prostatic hyperplasia, hyperlipidemia, fungal dermatological conditions, and sleep apnea.

On November 11, 2013, the claimant began pain management with C. Scott Anthony, DO, board certified in pain medicine pursuant to an order from the Workers' Compensation Court. Dr. Anthony was to provide continued medical maintenance and appropriate medications for the claimant's psychological overlay. The claimant reported much of his pain was associated with range of motion of the shoulders. Any type of motion of the shoulders tended to exacerbate his symptoms. He denied neck pain. He currently took Lipitor, Pravastatin, Celexa, Gabapentin, Lisinopril, Prilosec, aspirin, and Aleve. On examination, he was alert and oriented with moderate distress. Examination of his cervical spine showed good range of motion. There was no cervical paravertebral tenderness. He had pain with range of motion of the shoulder; abduction was painful, internal and external rotations were both painful and he had pain over the lateral aspect of the shoulder and the anterior aspect of the shoulder. Neurologically, he was quite intact and without deficit. Dr. Anthony diagnosed the claimant with bilateral shoulder pain following previous SLAP repair and ongoing depression secondary to his chronic pain syndrome. Dr. Anthony replaced the claimant's Celexa with Cymbalta and placed him on Tramadol. He wanted to utilize a non-narcotic regiment as opposed to opioids because, in Dr. Anthony's opinion, opioids might worsen the claimant's depression, which did seem to be fairly prominent at the time. He also wanted the claimant to wean off of the Gabapentin.

On March 25, 2014, the claimant reported to Dr. Anthony he was tolerating the Cymbalta and Tramadol with no degrees of side-effects. The Cymbalta had helped with his mood and he believed he was doing quite a bit better. The claimant returned on August 18, 2014. The claimant reported the Cymbalta had been quite beneficial in regards to his depression. He was continuing to function at a reasonably good level. He also reported he had been doing some gardening at home and had been more active with his son. Dr. Anthony noted the claimant had been very consistent and compliant with his medication regimen and showed no signs of over-medi[c]ation or sedation, and his drug screens had been quite consistent.

As for the opinion evidence, the State agency medical consultants' psychological assessments of Thomas VanHoose, PhD, and Bruce Lochner, PhD, found the claimant would be limited to simple tasks with superficial contact with coworkers and supervisors and no contact with the general public. I give these opinions great weight, as they are consistent with the totality of the evidence and have been endorsed in the RFC assessment above.

The State agency medical consultants' physical assessments of John Pataki, MD, and J.S., DO, are also given great weight as Dr. Pataki and Dr. J.S. limited the claimant to light exertion work with only occasional pushing, pulling, and overhead reaching with his upper extremities, and no climbing of ladders, ropes, or scaffolds.

> These opinions are also consistent with the totality of the evidence and have been endorsed in the RFC assessment above.
>
> The opinion of Dr. Wilson is given little weight as it is not consistent with the totality of the medical evidence. While the claimant does have some limitations, recent medical evidence shows the claimant is not as limited as opined by Dr. Wilson and has … improved in his ability to function. Although the claimant cannot return to work at his previous exertional level, the claimant's medical records show the claimant is not incapable of "performing any gainful employment" as opined by Dr. Wilson.
>
> In sum, the above RFC assessment is supported by recent medical evidence that reveals the claimant's depression has improved with his very consistent and compliant use of his medications. Furthermore, the claimant has only sought pain management treatment since October 2013. At his last visit in October 2013, with his new primary care physician, Dr. Phillips, the claimant had no complaints of pain or limitations in his ability to perform his activities of daily living. I find the claimant is capable of work consistent with the aforementioned RFC assessment.

(Tr. 17-21). Thus, in the decision, the ALJ thoroughly reviewed the record and medical opinions, identified Plaintiff's severe impairments of borderline intellectual functioning, depression, rotator cuff repair of both shoulders, degenerative joint disease of the AC joint, and mild degenerative disc disease of the lumbar spine, and limited Plaintiff to light work with limitations in pushing, pulling, and overhead reaching, and no climbing in the RFC, as well as simple instructions and incidental interaction with coworkers and supervisors and no public interaction. (Id. at 16-21).

Plaintiff contends the ALJ's RFC failed to account for Plaintiff's reduction in persistence and pace. (Pl. Br. at 19). Plaintiff states the VE testified if Plaintiff's productivity were reduced more than 20 percent, he would be unable to maintain employment. (Pl. Br. at 19) (citing Tr. 49). However, Plaintiff does not cite medical evidence for this allegation. The ALJ relied on the state agency physicians, who found Plaintiff could perform light work with only occasional pushing, pulling, and overhead reaching with his upper extremities, and no climbing of ladders, ropes, or scaffolds, and the ALJ included these limitations within the RFC. (Tr. 21).

14

Therefore, the record provided substantial evidence to support the ALJ's decision. It is not the reviewing court's position to reweigh the evidence or substitute judgment. As the Tenth Circuit has explained:

> "In reviewing the ALJ's decision, we neither reweigh the evidence nor substitute our judgment for that of the agency." Branum v. Barnhart, 385 F.3d 1268, 1270 (10th Cir. 2004). Rather, we examine the record as a whole to ascertain whether the ALJ's decision to grant benefits for a closed period, and to deny benefits thereafter, is supported by substantial evidence and adheres to the correct legal standards. See Shepherd v. Apfel, 184 F.3d 1196, 1199 (10th Cir. 1999). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). It is "more than a scintilla, but less than a preponderance." Id.

Newbold v. Colvin, 718 F.3d 1257, 1262 (10th Cir. 2013). Accordingly, the decision provides substantial evidence a reasonable mind might accept as adequate to support the ALJ's conclusion Plaintiff could perform a significant number of jobs in the national economy.

## CONCLUSION

For the reasons set forth above, the Court **DENIES** Plaintiff's appeal and **AFFIRMS** the Commissioner's decision in this case.

SO ORDERED on March 26, 2018.

_____
**Gerald B. Cohn**
**United States Magistrate Judge**